## UNITED STATES DISTRICT COURT OF
## THE DISTRICT OF CONNECTICUT

TAYLOR ROSE and SUSAN MOLINE,      CASE No.:
on behalf of the Nuvance Health 401(k)
Retirement Savings Plan, individually and
as representatives of a class of participants
and beneficiaries,

         Plaintiffs,

v.

NUVANCE HEALTH, INC., and
NORTHWELL HEALTH, INC.,

         Defendants.

_____/

### CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

Taylor Rose and Susan Moline ("Plaintiffs") bring this action as representatives of the Nuvance Health 401(k) Retirement Savings Plan against Nuvance Health, Inc. ("Nuvance") and Northwell Health, Inc. ("Northwell") for violations of the Employee Retirement Income Security Act, 29 U.S.C. Sections 1001-1461 ("ERISA").

### BRIEF OVERVIEW

1.     This action seeks to protect the retirement savings of current and former Nuvance employees who participated in the Plan. At the end of 2024, the Plan held $1,237,273,924 in net assets and reported 12,214 participants with account balances. Nuvance is administering a billion-dollar defined-contribution plan with institutional leverage and corresponding fiduciary obligations.

2.     The Nuvance-Northwell relationship matters by timeline and function. Nuvance entered an affiliation agreement with Northwell Health, Inc., on February 28, 2024, and the parties

1

closed on May 1, 2025. This Complaint uses "Nuvance" for pre-closing conduct and uses "Defendants" when the allegations concern post-closing conduct, each defendant's own role, or relief tied to Northwell's post-closing conduct or assumed obligations.

3.      The May 1, 2025, closing changed Nuvance's corporate control. It did not merge the Plan. After closing, Northwell, Inc. became the sole corporate member of Northwell Health System, Inc. As a result, Northwell Health System, Inc. became Nuvance Health's parent company. The Plan's financial statements identify Northwell, Inc. as Northwell's ultimate sole corporate member.

4.      Nuvance remains the Plan sponsor and continues to operate the Plan. Both Nuvance and Northwell are subject to ERISA for their own conduct and roles. Nuvance is liable for its fiduciary conduct before and after the May 1, 2025, closing. Northwell is liable to the extent it exercised fiduciary authority or control after closing, appointed or monitored Plan fiduciaries, participated in or enabled ongoing breaches, failed to remedy breaches it had power to correct, or assumed or succeeded to relevant Nuvance benefit-plan obligations.

5.      Nuvance breached its fiduciary duties to the Plan. First, it failed to follow the Plan's mandatory order for forfeitures. The Plan required forfeitures to pay Plan expenses before they reduced Nuvance's contributions. Nuvance reversed that order. Second, Nuvance permitted Fidelity to collect excessive recordkeeping compensation from the Plan and its participants.

6.      The Plan imposes a mandatory order as to how forfeitures may be used. The Plan document makes the hierarchy clear. Section 14.3, titled "Treatment of Forfeited Amounts," provides: "Whenever the non-vested balance of a Participant's Employer Contributions Sub-Account is forfeited during a Plan Year in accordance with the provisions of the preceding Section, the amount of such forfeiture **shall be applied first against Plan expenses** and then against the

Employer Contribution obligations for any subsequent Contribution Period of the Employer for which the Participant last performed services as an Employee. Notwithstanding the foregoing, however, if forfeitures that occurred during the prior Plan Year remain after all contribution obligations for the current Plan Year have been satisfied, and there are no Plan expenses to which such forfeitures can be applied, the remaining forfeitures shall be allocated among Participants' Accounts in accordance with the provisions of the following Section. Any forfeiture that occurs during a Plan Year must offset Employer Contributions, pay Plan expenses, or be allocated among Participants' Accounts as of the close of the following Plan year." (Emphasis added).

7.      Section 21.4, titled "Expenses," confirms the same priority: "To the extent paid from the Trust, **administrative expenses shall be paid first from any forfeitures**. Any remaining expenses shall be allocated among Participants' Accounts."

8.      Nuvance's audited financial statements repeated the same rule, stating that forfeitures from nonvested Company core and matching contributions were "**available to first reduce administrative expenses** and then offset Company contributions." (Emphasis added).

9.      But Nuvance did the opposite. For 2024, Nuvance reported that $3,434,859 in forfeitures were used to reduce Company contributions. For 2023, Nuvance reported that another $3,441,899 in forfeitures were used to reduce Company contributions. During those same years, the Plan reported $988,126 in administrative expenses for 2024 and $979,642 in administrative expenses for 2023. Nuvance therefore used more than $6.8 million in forfeitures to reduce Company contributions in 2023 and 2024 while the Plan reported nearly $2 million in administrative expenses in those same two years.

10.     The 2024 administrative-expense line was not abstract. It included $760,827 in recordkeeping fees, $176,215 in investment-advisory and investment-management fees, $2,400 in

contract-administrator fees, and $48,684 in other expenses. Nuvance also used a revenue-credit account to pay administrative expenses, including $120,821 in 2024, even though the Plan's forfeiture rule put forfeitures first. If forfeitures had to pay Plan expenses first, then administrative expenses should not have been paid from participant accounts, revenue credits, or other Plan-paid administrative-expense sources before available forfeitures were exhausted.

11.    Year after year, Nuvance used forfeited Plan assets to reduce its own contribution obligations while the Plan and participants continued paying recordkeeping, administrative, investment-advisory, audit, and other Plan expenses. That was not discretion. It was not harmless accounting. It was a transfer of value. Nuvance took assets that the Plan required to be used first for Plan expenses and used them first for Nuvance. On information and belief, Nuvance continued the same practice after closing.

12.    Participants paid too. Taylor Rose's Fidelity statements show account-level fee deductions of $36.50 in 2024, $73.00 in 2025, and $18.25 through June 1, 2026. Her statements identify those deductions as fees or administrative fees. Susan Moline's Nuvance 401(k) statement for the period January 31, 2018 through December 31, 2025 shows net fees of $312.96. The same statement reports $341.00 in administrative-fee deductions and $28.04 in revenue credits, producing the same net fee amount. Moline's transaction history separately identifies recurring "RECORDKEEPING FEE" and "ADMINISTRATIVE FEES" deductions. These charges reduced Plaintiffs' accounts dollar for dollar before lost investment earnings.

13.    As a result, Plaintiffs paid recordkeeping fees before and after the May 1, 2025, closing that should have been paid by forfeitures. Nuvance is responsible for its own conduct throughout. Northwell is responsible only for post-closing losses if it controlled, approved, continued, knowingly participated in, or failed to remedy the challenged practices, or if transaction

documents, governance documents, Plan documents, or applicable successor-liability principles show that Northwell or a Northwell-controlled entity assumed, succeeded to, or became responsible for relevant Nuvance benefit-plan obligations.

14.  These concrete account injuries matter. In *Matula v. Wells Fargo & Co.*, No. 25-2441, 2026 WL 1293295 (8th Cir. May 12, 2026), the Eighth Circuit affirmed dismissal of an ERISA forfeiture claim because the plaintiff pleaded only Plan-level harm and had not pleaded any injury to his own Plan account or identified expenses he paid that forfeitures could have offset.

15.  This case pleads exactly what *Matula* lacked: Plaintiffs' own account records show actual fee deductions from their individual retirement accounts during years when forfeitures should have paid Plan expenses first. Plaintiffs are not asking for a windfall, extra benefits, or an allocation of forfeitures the Plan forbids. They seek restoration of fees and expenses that should never have been charged to participant accounts before forfeitures were used for Nuvance.

16.  Recordkeeping shows an additional ERISA breach and a separate failure of prudence. Nuvance had a billion-dollar Plan, more than 12,000 participants with account balances, and the leverage to demand institutional pricing from Fidelity. It failed to use that leverage. Participants instead paid excessive direct recordkeeping and administrative charges while Fidelity also had access to indirect-compensation channels. A prudent fiduciary would have known Fidelity's total compensation, tested it against the market, and forced it down.

17.  The recordkeeping facts come from Nuvance's own ERISA filings and Plan materials. Each year, Form 5500 annual reports were filed for the Plan with the Department of Labor under penalty of perjury. Those filings were made on behalf of the Plan, identify Nuvance as the Plan sponsor, and are part of ERISA's reporting and disclosure framework. They exist so participants, beneficiaries, regulators, and the public can see how a plan is operated, funded, and

administered. They matter here because they are not litigation positions. They are annual ERISA disclosures made before this lawsuit, and they allow Fidelity's direct recordkeeping compensation to be calculated on a per-participant basis.

18.     For 2024, Nuvance reported $763,277 in direct compensation to Fidelity and 12,214 participants with account balances. That equals about $62.49 per participant before indirect compensation. Nuvance's participant disclosure separately admits that accounts may be charged a $53 annual recordkeeping fee and a $20 annual Non-Fidelity fee, each deducted quarterly. Plaintiffs' account records show those charges.

19.     The Fidelity trust materials describe Fidelity's role as directed, ministerial, recordkeeping-related work for the Plan. Fidelity kept accounts, prepared reports, processed Plan activity, and performed services under Nuvance's written direction. Those were standard recordkeeping services for a large defined-contribution plan.

20.     Yet Nuvance allowed Fidelity to receive about $62.49 per participant in direct compensation before indirect compensation, even though a billion-dollar plan should have obtained the same core services for approximately $25 per participant. That gap plausibly exceeds what a prudent fiduciary would have allowed for core recordkeeping services to a billion-dollar plan. It shows that Nuvance failed to know Fidelity's total compensation, failed to test the fee against the market, and failed to use the Plan's size to protect participants.

21.     Unless stopped, the same fiduciary failures will continue to drain the Plan and its participants each year through excessive fees, improper expense allocations, lost investment earnings, and contribution savings kept by Nuvance instead of restored to the Plan.

22.     Plaintiffs bring this action on behalf of the Plan under ERISA Sections 502(a)(2) and 502(a)(3), 29 U.S.C. Sections 1132(a)(2) and (a)(3). Plaintiffs seek restoration of Plan losses,

disgorgement of contribution savings and other gains, surcharge, a full accounting, removal of breaching fiduciaries, reform of Plan practices, and all other equitable relief necessary to restore the Plan to the position it would have occupied had Defendants complied with ERISA and the Plan.

## JURISDICTION AND VENUE

23.    This Court has subject-matter jurisdiction under 28 U.S.C. Section 1331 and ERISA Section 502(e)(1), 29 U.S.C. Section 1132(e)(1), because this action arises under ERISA and seeks relief under ERISA Sections 502(a)(2) and 502(a)(3), 29 U.S.C. Sections 1132(a)(2) and (a)(3).

24.    Venue is proper in this District under ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), and 28 U.S.C. Section 1391 because the Plan is administered in this District, Nuvance is located in this District, the fiduciary breaches alleged here occurred in this District, and Northwell's post-affiliation control, to the extent exercised, was exercised over a Connecticut-based Plan sponsor and Plan. Nuvance's Form 5500 filings identify Nuvance Health as the Plan sponsor located at 100 Reserve Road, Danbury, Connecticut 06810.

25.    This Court has personal jurisdiction over Nuvance because Nuvance resides in, conducts business in, administers the Plan in, and committed the challenged fiduciary breaches in this District.

26.    This Court has personal jurisdiction over Northwell under ERISA's nationwide-service provision and because Northwell purposefully directed post-affiliation conduct toward Nuvance in Connecticut, became part of the corporate-control structure governing Nuvance, and exercised or had the power to exercise control over Nuvance's benefits governance, fiduciary appointments, and Plan administration from and affecting this District.

**ERISA**

27.     ERISA's fiduciary duties are among the highest known to the law. A fiduciary must act with an eye single to the interests of participants and beneficiaries. *Donovan v. Bierwirth*, 680 F.2d 263, 271-72 & n.8 (2d Cir. 1982). ERISA requires a fiduciary to discharge duties with respect to a plan solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable administrative expenses. 29 U.S.C. Section 1104(a)(1)(A).

28.     ERISA also requires a fiduciary to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of a like enterprise with like aims. 29 U.S.C. Section 1104(a)(1)(B). A full heart and an empty head are not enough. ERISA also requires fiduciaries to act in accordance with the documents and instruments governing the plan insofar as those documents are consistent with ERISA. 29 U.S.C. Section 1104(a)(1)(D).

29.     ERISA forbids fiduciaries from dealing with plan assets in their own interest or for their own account. 29 U.S.C. Section 1106(b)(1). It also forbids a fiduciary from receiving consideration for its own account from any party dealing with the plan in connection with a transaction involving plan assets. 29 U.S.C. Section 1106(b)(3). These prohibitions matter when a sponsor or controlling parent affects assets that can either pay participant expenses or reduce employer contribution obligations.

30.     ERISA defines fiduciary status functionally. A person or entity is a fiduciary to the extent it exercises discretionary authority or discretionary control over plan management, exercises authority or control over management or disposition of plan assets, renders investment advice for a fee, or has discretionary authority or discretionary responsibility in plan administration. 29

8

U.S.C. Section 1002(21)(A). Northwell's liability therefore depends on what it did after May 1, 2025, not on labels alone.

## THE PLAN

31. The Plan is a defined-contribution retirement plan subject to ERISA. It is commonly referred to as a 401(k) plan and is established and maintained under written documents within the meaning of 29 U.S.C. Section 1102(a)(1). The Plan's assets are held in trust within the meaning of 29 U.S.C. Section 1103(a).

32. Nuvance is the Plan sponsor. The Plan's 2024 Form 5500 identifies the sponsor as Nuvance Health, 100 Reserve Road, Danbury, Connecticut 06810. The Nuvance Health Benefits Committee is identified in Plan materials as the Plan Administrator. Nuvance acts through that committee, its members, officers, employees, delegates, and service-provider relationships when it administers the Plan, appoints or monitors fiduciaries, manages Plan assets, directs Plan expenses, and controls the compensation paid to Plan service providers.

33. The Plan covers certain employees of Nuvance and its subsidiaries. As of December 31, 2024, the Plan had $1,237,273,924 in net assets available for benefits and 12,214 participants with account balances. The Plan had 13,041 total participants and beneficiaries at the end of the 2024 plan year. The Plan therefore had substantial bargaining power in the institutional marketplace for recordkeeping and administrative services.

34. The Plan automatically enrolls eligible employees at a six-percent contribution rate unless they elect otherwise. Participants may make pre-tax, after-tax, and Roth contributions and are immediately vested in their own contributions and earnings. Nuvance provides core contributions equal to two percent of compensation and matching contributions under the Plan's

9

formula. Participants vest in Nuvance core and matching contributions after three years of service, subject to the Plan's terms.

35.     When a participant terminates before becoming fully vested in Nuvance core or matching contributions, the nonvested portion remains in the Plan as a forfeiture. Those forfeitures are Plan assets. Nuvance had no right to use those assets except as ERISA and the Plan allowed. After May 1, 2025, Northwell had no right to continue, approve, direct, or fail to remedy any improper use of those assets if it acted as a fiduciary or controlled the fiduciaries responsible for the practice.

## DEFENDANTS

36.     Nuvance is liable because it is the Plan sponsor, has exercised authority and control over the Plan and its assets, has appointed and retained the Plan Administrator and other fiduciaries, and has controlled or failed to control the fiduciary machinery that caused the challenged losses.

37.     Nuvance is a fiduciary within the meaning of ERISA Section 3(21), 29 U.S.C. Section 1002(21), to the extent it exercises or exercised discretionary authority or discretionary control respecting Plan management, exercises or exercised authority or control over management or disposition of Plan assets, or has or had discretionary authority or discretionary responsibility in Plan administration.

38.     Nuvance's liability does not depend on naming the Benefits Committee or individual committee members as defendants. Nuvance selected the fiduciary structure through which the Plan was administered. Nuvance appointed, retained, monitored, and failed to remove the committee, committee members, officers, employees, delegates, and service providers responsible for Plan administration, forfeiture allocation, service-provider compensation,

participant-fee deductions, and Plan expense payments. When those fiduciaries acted for the Plan within the Nuvance governance structure, their acts and omissions were the acts and omissions Nuvance enabled, controlled, ratified, or failed to correct.

39.     Nuvance had the power and duty to monitor those fiduciaries and service providers. A sponsor that appoints plan fiduciaries cannot set the machinery in motion, stand aside while participants are harmed, and then disclaim responsibility because a committee name appears on the Plan documents. Nuvance had to ensure that its appointees followed the Plan, used forfeitures in the required order, and paid no more than reasonable compensation for recordkeeping and administrative services. Nuvance failed to do so.

40.     Nuvance also acted directly or through its officers, employees, committees, agents, and delegates in signing and filing the Plan's Form 5500 disclosures, selecting and monitoring service providers, approving or permitting participant-account fee deductions, directing or permitting use of forfeitures, and maintaining the Plan's administrative structure. Their knowledge and conduct are attributable to Nuvance for purposes of the ERISA claims pleaded here.

41.     Northwell's liability is not automatic parent-company liability and is not based on a Plan merger. On February 28, 2024, Nuvance entered into an affiliation agreement with Northwell Health, Inc. under which Northwell or an affiliated entity would become the active parent and sole corporate member of Nuvance Health. The transaction closed on May 1, 2025. Nuvance's 2024 Plan filing states that Northwell, Inc., the ultimate sole corporate member of Northwell, became the sole corporate member of Northwell Health System, Inc., which became the parent entity of Nuvance Health. The same filing states that the transaction's impact on the Plan, if any, had not yet been determined. The Plan documents therefore support post-closing corporate control; they do not show a merger of the Plan into a Northwell plan.

11

42.     Nuvance remains liable for its own fiduciary conduct before and after May 1, 2025. As to Northwell, Plaintiffs do not allege that Northwell became liable for earlier breaches merely because Northwell later became part of Nuvance's parent structure. Plaintiffs plead Northwell for post-closing conduct and, in the alternative, for pre-closing remedial obligations only if the affiliation agreement, assumption documents, governance documents, Plan documents, or applicable successor-liability principles show that Northwell or a Northwell-controlled entity assumed, succeeded to, controlled, or became responsible for Nuvance's benefit-plan liabilities.

## **PLAINTIFFS AND STANDING**

43.     Plaintiff Taylor Rose is a current participant in the Plan within the meaning of ERISA Section 3(7), 29 U.S.C. Section 1002(7). She participated in the Plan during the relevant period and continues to maintain an individual account in the Plan. She brings this action derivatively on behalf of the Plan under ERISA Sections 502(a)(2) and 502(a)(3), seeking Plan-wide relief.

44.     Plaintiff Susan Moline is a former participant in the Plan within the meaning of ERISA Section 3(7), 29 U.S.C. Section 1002(7). She participated in the Plan during the relevant period. Her Nuvance 401(k) account materials show employee contributions, employer contributions, an ending balance, and direct fee deductions. She also brings this action derivatively on behalf of the Plan under ERISA Sections 502(a)(2) and 502(a)(3).

45.     Plaintiffs have Article III standing because Nuvance's conduct caused concrete account-level financial injury to them. Plaintiffs' own accounts were charged Plan administrative and recordkeeping fees that forfeitures were required to pay first. This is not a case in which participants allege only abstract Plan injury, ask for extra benefits not provided by the Plan, or

speculate that the sponsor might have chosen a different forfeiture use. Plaintiffs' account records show actual deductions from their retirement accounts.

46. Taylor Rose's 2024 Fidelity statement for the period January 1, 2024, through December 31, 2024, shows $36.50 in fees deducted from her account. The statement's account-activity section identifies those charges as administrative fees. The same statement shows that she made employee contributions, received employer contributions, and maintained an account balance in the Plan. Her 2025 Fidelity statement shows another $73.00 in fees. Her 2026 statement for the period January 1, 2026, through June 1, 2026, shows another $18.25 in fees. Her account was charged at least $127.75 in direct account-level fees before lost earnings. Those deductions reduced her account dollar for dollar and show that the same fee structure continued after the May 1, 2025 closing.

47. Susan Moline's Nuvance 401(k) statement for the period January 31, 2018, through December 31, 2025, shows $312.96 in fees deducted from her account. It also shows employee contributions of $50,071.77, employer contributions of $25,353.89, dividends and interest of $8,317.94, an ending balance of $94,673.21, and a vested balance of $94,673.21. Her Nuvance 401(k) transaction history separately identifies recurring "RECORDKEEPING FEE" and "ADMINISTRATIVE FEES" deductions. Those charges reduced her account and deprived her of the investment return those dollars would have earned.

48. Plaintiffs' injuries are traceable to Nuvance and, after May 1, 2025, to Northwell under the Northwell theories pleaded above. The Plan required forfeitures to pay Plan expenses first. Nuvance instead used millions of forfeiture dollars to reduce Company contributions while Plan expenses and account-level charges continued. After May 1, 2025, the same fee structure

13

continued. If forfeitures had been used first as the Plan required, Plaintiffs would not have paid those fees.

49.    Plaintiffs' injuries are redressable. If Nuvance and, for post-May 1, 2025, conduct or assumed obligations, Northwell, restore to the Plan the expenses that forfeitures should have paid, disgorge contribution savings, restore lost investment earnings, and refund or credit improper participant-account deductions, Plaintiffs' accounts and the accounts of similarly situated participants can be made whole.

50.    Plaintiffs seek restoration of losses caused by Nuvance's fiduciary breaches, and any post-closing Northwell fiduciary failure or assumed obligation.

## SUPPORTING FACTUAL ALLEGATIONS

### A.    Forfeiture Allegations

51.    The Plan document controls the use of forfeitures. It did not let Nuvance use forfeitures however it wished. ERISA requires fiduciaries to follow the documents governing the Plan when those documents are consistent with ERISA. Here, the Plan document gave Nuvance a mandatory sequence. Forfeitures had to be applied first to Plan expenses. Only then could remaining forfeitures reduce employer-contribution obligations.

52.    Section 14.3 of the Plan is titled "Treatment of Forfeited Amounts." It provides: "Whenever the non-vested balance of a Participant's Employer Contributions Sub-Account is forfeited during a Plan Year in accordance with the provisions of the preceding Section, the amount of such forfeiture shall be applied first against Plan expenses and then against the Employer Contribution obligations for any subsequent Contribution Period of the Employer for which the Participant last performed services as an Employee."

14

53. The next sentence addresses the only circumstance in which forfeitures may be allocated to participant accounts: "Notwithstanding the foregoing, however, if forfeitures that occurred during the prior Plan Year remain after all contribution obligations for the current Plan Year have been satisfied, and there are no Plan expenses to which such forfeitures can be applied, the remaining forfeitures shall be allocated among Participants' Accounts in accordance with the provisions of the following Section." That command uses order words, not open-ended discretion. "First" means first. "Then" means after.

54. Section 21.4, titled "Expenses," reinforces the same rule. It states: "The expenses of operation and administration of the Plan, including the expenses of the Administrator and fees of the Trustee, shall be paid from the Trust, unless the Sponsor elects to make payment. To the extent paid from the Trust, administrative expenses shall be paid first from any forfeitures. Any remaining expenses shall be allocated among Participants' Accounts." The hierarchy is mandatory. The Sponsor may pay expenses itself. Otherwise, administrative expenses paid from the Trust must be paid first from forfeitures. Only after forfeitures are exhausted may remaining administrative expenses be charged to participant accounts.

55. Section 6.13 does not save Nuvance. It confirms the violation. Section 6.13 reduces employer contributions only by forfeitures "that are not used to pay Plan expenses" and only when those forfeitures are applied against employer contributions "as provided in Article VII or XIV, as applicable."

56. Article XIV contains Section 14.3. Section 14.3 supplies the order: forfeitures "shall be applied first against Plan expenses and then against the Employer Contribution obligations." Section 6.13 therefore does not authorize Nuvance to take contribution offsets first. It authorizes contribution offsets only for forfeitures that remain after Plan expenses have been

paid in the order required by Article XIV. Plaintiffs do not allege that the Plan forbade all contribution offsets. The breach is that Nuvance took the offset too soon.

57.     The Plan hierarchy protected participants from needless account deductions. It also prevented Nuvance from using nonvested employer contributions as a corporate subsidy while participants paid administrative expenses. That is why the order matters. If Nuvance could use forfeitures first for itself while charging expenses to participants, the word "first" would do no work. After May 1, 2025, Northwell could not lawfully continue, approve, direct, or fail to remedy the same practice if it acted as a fiduciary, controlled the responsible fiduciaries, or assumed the relevant obligations.

58.     Nuvance's audited financial statements acknowledged the same hierarchy. They stated that forfeitures from nonvested Company core and matching contributions are available to first reduce administrative expenses and then offset Company contributions. Those statements were not stray language. They matched the Plan's expense-first structure and confirmed that Nuvance knew the governing rule.

59.     Every dollar used to reduce Nuvance's contributions benefited Nuvance. Every dollar charged to participant accounts harmed participants. The Plan required the opposite order.

60.     Nuvance did not follow that order. For 2024, the Plan reported $988,126 in administrative expenses. Schedule H identified $2,400 in contract-administrator fees, $760,827 in recordkeeping fees, $176,215 in investment-advisory and investment-management fees, and $48,684 in other expenses. Yet the Plan's financial statements reported that $3,434,859 in forfeitures were used to reduce Company contributions in 2024. Forfeitures that should have been applied first to expenses instead produced contribution relief for Nuvance. The Plan's 2024

Summary Annual Report confirms the same basic picture: $988,126 in administrative expenses, 13,041 participants or beneficiaries, and $1,237,273,924 in year-end net assets.

61.     For 2023, the Plan reported $979,642 in administrative expenses. The 2024 financial statements reported that $3,441,899 in forfeitures were used to reduce Company contributions for the year ended December 31, 2023. The 2023 filing had used more ambiguous language by stating that forfeitures were used to reduce Company contributions and administrative expenses. The later 2024 comparative disclosure matters because it identified the 2023 use as reducing Company contributions. That supports the inference that Nuvance took contribution relief while Plan expenses remained paid from other sources.

62.     For 2022, the Plan reported approximately $604,321 in administrative expenses. The financial statements reported that $1,326,780 in forfeitures were used to reduce Company contributions and administrative expenses. That combined phrase does not defeat the claim; it confirms that forfeitures were available and used during a year when Plan expenses existed.

63.     For 2021, the Plan reported $737,813 in administrative expenses, and the financial statements reported that $370,000 in forfeitures were used to reduce Company contributions and administrative expenses. The same 2021 financial statements reported $572,254 in administrative expenses for 2020 and $350,000 in forfeitures used to reduce Company contributions and administrative expenses for 2020. These years show the same recurring practice: forfeitures, Plan expenses, participant-account fee mechanisms, and contribution-offset language all existed at the same time.

64.     The primary Plan loss is the amount of Plan expenses and participant-account charges that forfeitures should have paid first, plus lost investment earnings on those amounts.

17

65. Participant-level fee deductions prove the injury. The Required Disclosure Information for the Plan states that participants may be subject to asset-based fees, Plan administrative fees and expenses, and individual fees and expenses. It states that Plan administrative fees may include recordkeeping, legal, accounting, trustee, and other administrative expenses. It then states that the Plan may deduct a $53 annual recordkeeping fee and $20 in annual Non-Fidelity fees from Plan accounts, each deducted quarterly. Plaintiffs' account statements show exactly those kinds of deductions.

66. Every dollar of forfeitures used to reduce Nuvance's contributions saved Nuvance a dollar. Had Nuvance followed the Plan and applied forfeitures first to Plan expenses, Plaintiffs and similarly situated participants would not have paid those fees, or would have paid materially less. Rose's 2025 and 2026 account charges show that the same account-level fee structure continued after the May 1, 2025 closing. The direct account deductions are a conservative measure of injury. They exclude asset-based fee drag, revenue-sharing arrangements, float, lost investment earnings, and additional charges that discovery will identify. They also exclude the full value of Nuvance's contribution savings.

**B. Recordkeeping and Fee Allegations**

67. Nuvance also allowed Fidelity to collect excessive recordkeeping compensation. The problem was not just the direct charge shown in the Form 5500. A prudent fiduciary had to know Fidelity's total compensation from every source. That included direct recordkeeping fees, participant-level charges, revenue sharing, indirect compensation, float, cash-sweep earnings, managed-account revenue, brokerage compensation, and any other compensation Fidelity or its affiliates received from the Plan relationship. Nuvance had a billion-dollar Plan with more than 12,000 participants and the leverage to demand institutional pricing. It failed to use that leverage.

18

68.    The Plan's own filings and materials show the Plan's size, participant count, Fidelity's direct compensation, the participant-level fee schedule, Fidelity's ministerial services, indirect-compensation channels, revenue credits, and same-recordkeeper benchmarks for billion-dollar plans. Those facts show excessive compensation, an imprudent process, and a failure to protect participants from fees the Plan's size should have avoided.

69.    The Plan materials identify Fidelity's role as administrative, directed, and recordkeeping-related. The SPD describes Fidelity as the Plan's Administrative Delegate and states that Fidelity assists the Plan Administrator by providing forms and information needed to administer the Plan. The Trust Agreement likewise describes Fidelity as a directed trustee and requires Fidelity to maintain accounts and report Trust activity. These materials show the service bundle Nuvance bought and had to monitor: account maintenance, reporting, participant-facing administration, transaction support, and related recordkeeping work.

70.    Nuvance's participant materials identify the participant-facing services tied to that recordkeeping platform. Participants could access account statements through Fidelity NetBenefits, change investment elections, direct future contributions, obtain paper statements by calling Fidelity, receive plan communications, review investment options, and use account-level services. Plaintiffs' statements show the same ordinary output: account balances, contributions, fees, investment holdings, dividends and interest, asset allocation, personal rate of return, and market value by investment. These documents identify the service bundle in concrete terms.

71.    The Plan had the scale to demand institutional pricing. At year-end 2024, it had more than $1.2 billion in net assets and 12,214 participants with account balances. The Plan's 2024 Schedule H reported $760,827 in recordkeeping fees. Dividing that amount by 12,214 participants with account balances yields approximately $62.29 per participant in direct recordkeeping fees for

2024. The 2024 Schedule C reported Fidelity Investments Institutional Operations Company receiving $763,277 in direct compensation. Dividing that amount by 12,214 participants with account balances yields approximately $62.49 per participant. Either direct-fee measure was more than double the $25 per-participant ceiling a prudent fiduciary should have secured before counting indirect compensation.

72.    Plaintiffs' participant materials show the same problem at the account level. The Required Disclosure Information states that the Plan may deduct a $53 annual recordkeeping fee and a $20 annual Non-Fidelity fee from Plan accounts, each deducted quarterly. Taylor Rose paid $73.00 in direct fees in 2025, matching that disclosed annual structure. Susan Moline's account was charged $312.96 in fees during the statement period reflected in her Nuvance 401(k) materials, and her transaction history identifies recordkeeping and administrative fee deductions. Those amounts exceeded what a prudent fiduciary should have allowed for a billion-dollar Plan receiving ordinary Fidelity recordkeeping services.

73.    The $25 benchmark is meaningful because it is tied to the same recordkeeper, the same large-plan market, and the same type of ordinary recordkeeping services. In *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 214-16 (D. Mass. 2020), the record showed that Fidelity's own billion-dollar plan could obtain recordkeeping services at a fraction of what Nuvance allowed this Plan and its participants to pay. Fidelity had stipulated in that case that, if it were a third party negotiating at arm's length, the value of its recordkeeping services for a billion-dollar plan ranged from $14 to $21 per participant per year during the relevant period. Nuvance's Plan exceeded $1 billion in assets, used Fidelity, and received ordinary ministerial recordkeeping and account services. Nuvance had every reason to obtain pricing at or below $25 per participant per year.

74. This is an apples-to-apples pleading. Plaintiffs do not compare the Plan's all-in compensation to another plan's direct fees alone. Nuvance's direct fees alone were excessive because they exceeded a reasonable all-in fee for Fidelity's recordkeeping services to a billion-dollar plan. Fidelity-related indirect compensation, revenue sharing, float, cash-sweep earnings, investment-option payments, offsets, managed-account revenue, brokerage compensation, or other compensation retained by Fidelity or its affiliates only increases the excess. If any indirect compensation was fully credited back to the Plan, the accounting can account for that credit; it does not make the direct $62 to $73 annual charge reasonable.

75. The public record shows indirect compensation and compensation channels that a prudent fiduciary had to investigate. The Plan's disclosures state that administrative services may be paid through offsets or payments associated with investment options.

76. The 2024 financial statements state that the Custodian receives revenue from investment fund service providers, uses that revenue to offset administrative expenses, or creates credits in the revenue-credit account, and uses that account to pay administrative expenses. Schedule C identifies Fidelity-related indirect-compensation formulas tied to investments, including 0.40%, 0.35%, 0.25%, 0.15%, and 0.12%. Even small asset-based percentages can generate substantial compensation when applied to a billion-dollar plan or large investment-option balances.

77. Revenue sharing and indirect compensation are not free. They are participant money embedded in investment expenses and service-provider economics. A prudent fiduciary would require Fidelity to provide fee transparency, relationship-pricing analyses, revenue-sharing reports, offset reports, float reports, cash-sweep reports, managed-account compensation reports, BrokerageLink compensation reports, and total-compensation summaries. A prudent fiduciary

would calculate whether direct fees plus indirect compensation exceeded a reasonable recordkeeping fee. If so, it would demand rebates, credits, lower direct fees, lower-cost share classes, a different recordkeeper, or a different compensation model.

78.     Nuvance failed to protect participants from the combined effect of direct charges and indirect compensation. Nuvance paid or allowed approximately $62 per participant in direct recordkeeping fees in 2024, permitted direct participant charges reaching $73 per year, and allowed revenue-sharing and indirect compensation arrangements to continue. Nuvance then compounded the harm by using forfeitures to reduce Nuvance's contributions rather than to pay or reduce the administrative expenses generated by this fee structure. After May 1, 2025, the same fee structure continued; Northwell is responsible for post-closing losses under the Northwell theories pleaded above.

79.     Comparator plans provide an additional meaningful benchmark for the excessive-recordkeeping allegations. Plaintiffs do not rely on a bare price comparison. The figures below come from the uploaded 2024 Form 5500 filings and use the same fields for each plan: end-of-year participants with account balances from line 6g(2), end-of-year net assets from Schedule H line 1l, and Schedule C direct compensation reported for the plan recordkeeper.

80.     The comparator plans are similar in the features that drive recordkeeping pricing: plan size, participant counts, institutional defined-contribution administration, and routine recordkeeping services. All of the comparator plans used Fidelity, the same recordkeeper Nuvance used. Each comparator had roughly 10,900 to 14,600 participants with account balances and substantial plan assets.

| Plan Name | Record-keeper | Total # participants w/ account balances | Dollar value of plan assets | Total reported recordkeeping and administrative | Direct recordkeeping and administrative service costs |
|---|---|---|---|---|---|

|  |  |  |  | service costs paid in 2024 | per-participant basis |
|---|---|---|---|---|---|
| Nuvance Health 401(k) Retirement Savings Plan | Fidelity | 12,214 | $1,237,273,924 | $763,277 | $62.49 |
| Block 401(k) Plan | Fidelity | 11,565 | $1,235,160,995 | $297,064 | $25.68 |
| Saint Francis Health System 401(k) | Fidelity | 14,619 | $1,005,826,659 | $315,506 | $21.58 |
| RPM International Inc. 401(k) Trust and Plan | Fidelity | 10,947 | $1,392,895,670 | $224,072 | $20.47 |
| Alcon | Fidelity | 12,350 | $1,081,344,733 | $251,439 | $20.35 |
| Netflix 401(k) Plan | Fidelity | 11,401 | $2,348,392,285 | $205,887 | $18.06 |

81.     This comparator pleading addresses the pleading concern raised in *Singh v. Deloitte LLP,* 123 F.4th 88 (2d Cir. 2024). Plaintiffs do not allege only that other plans paid less. They identify the Plan's services, Fidelity's role, the participant-level charges, the direct-compensation figures, the indirect-compensation channels, and same-recordkeeper comparators. The services include account maintenance, participant-account administration, transaction processing, contribution processing, distribution and loan support, participant communications, website and call-center support, statements, plan-sponsor reporting, and Form 5500 support. Those are core recordkeeping and administrative services that national recordkeepers provide to large defined-contribution plans.

82.     The comparison also isolates reported direct compensation before adding indirect compensation. In 2024, the Nuvance Plan reported $763,277 in direct compensation to Fidelity, or

$62.49 per participant with an account balance. The Fidelity comparator plans reported $25.68, $21.58, $20.47, $20.35, and $18.06 per participant. Each comparator paid materially less than Nuvance, even before counting Fidelity's indirect compensation, revenue-sharing formulas, float or short-term cash compensation, managed-account economics, brokerage compensation, and other compensation that discovery will quantify.

83.    The table uses a like-for-like public measure. For each plan, the numerator is the Schedule C direct compensation reported for the plan's recordkeeper and the denominator is the Form 5500 line 6g(2) end-of-year count of participants with account balances. The comparison is conservative because it counts only reported direct compensation. It does not include indirect compensation, revenue sharing, float, managed-account revenue, brokerage compensation, or other compensation that may have increased the recordkeeper's total pay.

84.    Nuvance and Northwell may argue that public Form 5500 comparisons do not reveal every service term, quality metric, revenue-sharing offset, sponsor-paid expense, or negotiated arrangement for each comparator plan. That argument raises factual issues. It does not defeat plausibility. The table is not the whole claim and not the final loss model. It is a public, like-for-like direct-fee benchmark. Plaintiffs also plead the Plan's services, participant-level charges, Fidelity's role, indirect-compensation channels, revenue credits, Fidelity's billion-dollar-plan pricing admissions, and the fact that Nuvance's direct fee alone exceeded a reasonable all-in recordkeeping fee.

85.    The prudence inquiry is context-specific. That context includes direct fees, indirect fees, participant-level charges, revenue credits, float, the Plan's size, the services actually purchased, the market for comparable recordkeeping services, the comparator plans, Fidelity's own pricing admissions, Nuvance's failure to use forfeitures first to pay Plan expenses, and the

24

absence of any public evidence that Nuvance ran a competitive RFP or negotiated total Fidelity compensation to a reasonable level. Taken together, those facts plausibly show a flawed fiduciary process and excessive compensation.

86.    A prudent fiduciary would have used an RFP or equivalent market test. A request for proposal is not ceremonial. It is how fiduciaries test whether the incumbent recordkeeper's price remains competitive. A meaningful RFP requests pricing from multiple capable providers on a comparable basis, identifies all included services, requires full disclosure of direct and indirect compensation, and asks for flat per-participant pricing, fee caps, and revenue-sharing credits. A prudent fiduciary need not change recordkeepers every time it runs an RFP. The process itself creates leverage and gives the fiduciary the information needed to negotiate.

87.    The point of an RFP is not just to complete paperwork or check boxes. It is price discipline. It forces the incumbent recordkeeper to compete against the market and gives fiduciaries the information needed to negotiate from strength

88.    The public record does not show that Nuvance conducted a meaningful RFP, obtained competitive bids, or used the Plan's leverage to force Fidelity's compensation down to a reasonable level. If Nuvance did run a meaningful RFP, the results will be in Nuvance's files. If those results show reasonable pricing and prudent process, Nuvance can produce them. Northwell can do the same for the post-May 1, 2025 period if it contends it prudently monitored or corrected the practice. Plaintiffs allege the opposite based on the fees charged, the Plan's size, the public disclosures, Fidelity's role, Fidelity's own prior admissions, the comparator plans, the post-closing continuation of participant fees, and the absence of any public indication that Nuvance or Northwell forced Fidelity's total compensation to a reasonable level.

89.     If Nuvance or Northwell claims the fees were justified by services not visible in public filings or participant materials, those services are within Nuvance's, Northwell's, and Fidelity's possession. Plaintiffs allege, based on the Plan's size, the disclosed services, Fidelity's standard recordkeeping platform, participant-level fee deductions, Schedule H and Schedule C disclosures, revenue-credit disclosures, Fidelity's directed and ministerial role, comparator plans, and Fidelity's own prior admissions about billion-dollar plan pricing, that the Plan and participants paid more than a prudent fiduciary would have paid for the same or materially similar services.

90.     The excessive-fee claim seeks the difference between what the Plan and participants paid Fidelity and what a prudent fiduciary would have caused the Plan to pay for the same or better services, which should have been approximately $25 per participant per year for core recordkeeping. The forfeiture claim seeks restoration of expenses that forfeitures should have paid first, disgorgement of Nuvance's contribution savings, and lost earnings. The same dollar may not be recovered twice, but both theories matter because they measure different fiduciary failures.

## CLASS ACTION ALLEGATIONS

91.     Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of themselves and the following proposed Class: "All persons who were participants in or beneficiaries of the Nuvance Health 401(k) Retirement Savings Plan at any time from June 10, 2020, through the date of judgment." Excluded from the Class are Defendants, any fiduciary responsible for the challenged conduct, and any officers, directors, committee members, or employees of Defendants responsible for the challenged conduct.

92.     The Class is so numerous that joinder is impracticable. The Plan's 2024 Form 5500 reported 12,214 participants with account balances at the end of the plan year and 13,041 total participants and beneficiaries. Plaintiffs' claims are typical of Class members' claims. Like other

Class members, Plaintiffs participated in the Plan, maintained individual accounts, paid or bore Plan expenses, and were injured by Nuvance's uniform administration of forfeitures and recordkeeping compensation and by any post-May 1, 2025 Northwell fiduciary continuation, approval, failure to remedy, or assumed obligation. Plaintiffs' own statements show actual account-level fee deductions. Their claims arise from the same Plan terms, same fiduciary structure, same forfeiture practices, same Fidelity compensation arrangements, and same Plan-wide conduct that affected the Class.

93. Plaintiffs will fairly and adequately represent the Class. Their interests align with the Class because they seek Plan-wide restoration and equitable relief for the same fiduciary breaches that harmed the Plan and participants. Plaintiffs have retained counsel experienced in ERISA class-action litigation. Plaintiffs have no interests antagonistic to the Class.

94. Common questions of law and fact exist and predominate over individual questions, including whether Nuvance is and was a Plan fiduciary; whether Northwell acted as a fiduciary, co-fiduciary, appointing fiduciary, monitoring fiduciary, successor, or assumer after May 1, 2025; whether forfeitures were Plan assets; whether the Plan required forfeitures to pay Plan expenses first; whether Nuvance used forfeitures to reduce employer contributions while Plan expenses remained charged to the Plan or participants; whether Nuvance paid excessive recordkeeping compensation; whether Nuvance failed to monitor the Benefits Committee and other fiduciaries; whether Northwell continued, approved, directed, failed to remedy, assumed, or succeeded to any relevant obligations after May 1, 2025; whether Nuvance engaged in prohibited self-dealing; whether Northwell engaged in prohibited self-dealing after May 1, 2025 to the extent it acted as a fiduciary or assumed relevant obligations; whether Nuvance caused losses to the Plan; whether

Northwell caused post-closing losses to the Plan or assumed responsibility for remedial obligations; and the proper measure of Plan-wide relief.

95. Class certification is proper under Rule 23(b)(1)(A) because separate actions would risk inconsistent adjudications establishing incompatible standards of conduct for Nuvance and for Northwell to the extent Northwell acted as a fiduciary or assumed relevant obligations. Class certification is proper under Rule 23(b)(1)(B) because separate adjudications would, as a practical matter, dispose of or impair the interests of other Plan participants and beneficiaries. Class certification is also proper under Rule 23(b)(2) because Nuvance acted or refused to act on grounds generally applicable to the Class, and Northwell did the same after May 1, 2025 to the extent it acted as a fiduciary or assumed relevant obligations. In the alternative, certification is proper under Rule 23(b)(3) because common questions predominate and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

**FIRST CLAIM FOR RELIEF**
*Breach of Fiduciary Duty of Loyalty*
*ERISA Sections 404(a)(1)(A), 409, and 502(a)(2) and (a)(3)*

96. Plaintiffs re-allege and incorporate paragraphs 1–21, 26–30, 31–42, 43–50, 51–66, and 91–95 as if fully set forth here. ERISA required Nuvance to discharge its duties solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits and defraying reasonable Plan expenses. Nuvance breached that duty by using forfeitures for its own benefit before using them to pay Plan expenses, while participants paid Plan expenses and recordkeeping charges. Northwell breached the same duty after May 1, 2025 under the Northwell theories pleaded above.

97. Every dollar of forfeitures used to reduce Nuvance's contributions saved Nuvance a dollar. Every dollar charged to participant accounts reduced participant retirement savings.

28

Nuvance chose itself over participants by taking contribution relief before the Plan expenses were paid in the order the Plan required. After May 1, 2025, Northwell made or allowed the same choice if discovery shows the fiduciary control, knowing participation, failure to remedy, or assumed obligations pleaded above. That choice violated ERISA's duty of loyalty.

98.    As a direct and proximate result of Nuvance's loyalty breaches and Northwell's post-closing fiduciary breaches or assumed obligations, the Plan and participants suffered losses and Nuvance and any responsible Northwell entity obtained profits and benefits. Nuvance is liable for restoration, disgorgement, surcharge, accounting, and other appropriate equitable relief. Northwell is liable for post-closing losses and gains tied to the Northwell theories pleaded above.

**SECOND CLAIM FOR RELIEF**
*Prohibited Transactions and Fiduciary Self-Dealing*
*ERISA Sections 406(b), 409, and 502(a)(2) and (a)(3)*

99.    Plaintiffs re-allege and incorporate paragraphs 1–15, 26–30, 31–42, 43–50, 51–66, and 91–95 as if fully set forth here. Nuvance is and was a fiduciary with respect to the management and disposition of forfeitures and Plan assets. ERISA Section 406(b)(1) prohibits a fiduciary from dealing with Plan assets in the fiduciary's own interest or for the fiduciary's own account. ERISA Section 406(b)(3) prohibits a fiduciary from receiving consideration for its own account from any party dealing with the Plan in connection with a transaction involving Plan assets. Northwell is liable for post-closing prohibited transactions only under the Northwell theories pleaded above.

100.    Forfeitures were Plan assets. Nuvance dealt with those assets in its own interest and for its own account by using them to reduce Nuvance's contribution obligations before using them to pay Plan expenses as required by the Plan. Nuvance received dollar-for-dollar contribution relief and other financial benefits from those transactions. Northwell is liable for post-closing self-dealing only if discovery shows fiduciary control, knowing participation, failure to remedy, or

29

assumed obligations as pleaded above. Nuvance is liable for restoration, disgorgement, surcharge, accounting, and other appropriate equitable relief. Northwell is liable for the same relief only for losses or gains tied to the Northwell theories pleaded above.

### THIRD CLAIM FOR RELIEF
*Breach of Fiduciary Duty of Prudence*
*ERISA Sections 404(a)(1)(B), 409, and 502(a)(2) and (a)(3)*

101.    Plaintiffs re-allege and incorporate paragraphs 1–22, 26–30, 31–42, 43–50, 51–90, and 91–95 as if fully set forth here. ERISA required Nuvance to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence that a prudent fiduciary familiar with such matters would use under like circumstances. That duty required a reasoned fiduciary process in administering forfeitures, paying Plan expenses, monitoring participant-account deductions, and controlling compensation paid to Fidelity and other Plan service providers. Northwell owed and breached that duty after May 1, 2025, to the extent it acted as a fiduciary, controlled or monitored responsible fiduciaries, participated in or failed to remedy ongoing breaches, or assumed or succeeded to relevant Nuvance benefit-plan obligations.

102.    A prudent fiduciary would have identified all Plan expenses paid from the Trust, the revenue-credit account, other Plan-paid administrative-expense sources, or participant accounts. It would have ensured that forfeitures were applied first to those expenses before reducing Nuvance's contribution obligations. A prudent fiduciary also would have kept records showing the timing, amount, sequence, and purpose of every forfeiture allocation and every expense payment. Nuvance failed to use that prudent process. Northwell failed to use that process after May 1, 2025 under the Northwell theories pleaded above.

103.    Nuvance's imprudence did not stop with forfeitures. Nuvance also had a fiduciary duty to monitor, negotiate, control, and ensure the reasonableness of compensation paid to Fidelity

and other Plan service providers. Recordkeeping services for large defined-contribution plans are available from multiple national providers. A prudent fiduciary of a billion-dollar plan uses the plan's bargaining power to obtain reasonable fees and to ensure that total compensation from all sources does not exceed the market value of the services provided. Northwell owed and breached that duty after May 1, 2025, to the extent it exercised fiduciary authority or control, monitored responsible fiduciaries, participated in or failed to remedy ongoing breaches, or assumed or succeeded to relevant obligations.

104. Nuvance caused or allowed the Plan and participants to pay excessive recordkeeping and administrative compensation to Fidelity. In 2024, Schedule H reported $760,827 in recordkeeping fees and Schedule C reported Fidelity receiving $763,277 in direct compensation. Divided by 12,214 participants with account balances, that direct recordkeeping compensation was about $62 per participant before indirect compensation. Plaintiffs' participant disclosures and account statements show direct recordkeeping and administrative fee deductions, including Taylor Rose's $73 in 2025 and Susan Moline's $312.96 in fees during her Nuvance 401(k) statement period.

105. Reasonable recordkeeping compensation for this Plan should have been no higher than $25 per participant per year. Nuvance's direct fees alone exceeded that reasonable all-in benchmark. Fidelity also received or benefited from indirect compensation, revenue-sharing arrangements, offsets, investment-option payments, float, cash-sweep earnings or similar short-term cash compensation, managed-account revenue, brokerage compensation, and other compensation that discovery will quantify, to the extent Fidelity or its affiliates retained or received such compensation. Nuvance failed to identify, monitor, cap, rebate, or negotiate all sources of

Fidelity compensation. Northwell is liable for post-closing losses from the same failures only under the limited Northwell theories pleaded above.

106.    A prudent fiduciary would have obtained the same or better recordkeeping services for materially less, including through a flat per-participant arrangement, fee cap, revenue-sharing credit, lower-cost share classes, or periodic RFP process. A prudent fiduciary also would have used available forfeitures in the order required by the Plan to reduce or eliminate administrative and recordkeeping expenses before allowing those expenses to be charged to participants or used to support excessive service-provider compensation. Nuvance did neither. Northwell did neither after May 1, 2025 under the Northwell theories pleaded above.

107.    Nuvance's prudence breaches and Northwell's post-closing fiduciary breaches or assumed obligations caused losses to the Plan and participants. Those losses include, without limitation, Plan expenses and participant-account charges that forfeitures should have paid first, excessive recordkeeping and administrative compensation paid above a reasonable market rate, lost investment earnings, and other losses that discovery and an accounting will show. Nuvance is liable under ERISA Sections 409 and 502(a)(2) and (a)(3) for restoration of Plan losses, disgorgement, surcharge, accounting, and other appropriate equitable relief. Northwell is liable for post-closing losses and gains tied to the Northwell theories pleaded above.

### FOURTH CLAIM FOR RELIEF
*Failure to Follow Plan Documents*
*ERISA Sections 404(a)(1)(D), 409, and 502(a)(2) and (a)(3)*

108.    Plaintiffs re-allege and incorporate paragraphs 1–15, 26–30, 31–42, 43–50, 51–66, and 91–95 as if fully set forth here. ERISA requires Nuvance to discharge its duties in accordance with the documents and instruments governing the Plan to the extent those documents are consistent with ERISA. 29 U.S.C. Section 1104(a)(1)(D). Nuvance is and was a fiduciary with

respect to the administration of the Plan, the management and disposition of Plan assets, the use of forfeitures, the payment of Plan expenses, and the monitoring of the fiduciaries and service providers responsible for those functions. Northwell owed and breached the same duty after May 1, 2025, under the Northwell theories pleaded above.

109. The Plan documents imposed a mandatory forfeiture hierarchy. Section 14.3 required forfeitures to be applied "first against Plan expenses and then against the Employer Contribution obligations." Section 21.4 required administrative expenses paid from the Trust to be paid first from forfeitures, with remaining administrative expenses allocated among participant accounts. Section 6.13 likewise reduced employer contributions only by forfeitures "that are not used to pay Plan expenses" and only as Article XIV permitted. Read together, these provisions required Plan expenses to come first and employer-contribution offsets to come second.

110. Nuvance failed to follow that governing order. Rather than apply forfeitures first to Plan expenses, Nuvance used millions of dollars in forfeitures to reduce Company contributions while Plan expenses remained charged to the Plan, the revenue-credit account, other Plan-paid administrative-expense sources, and participant accounts. In 2023 and 2024 alone, Nuvance used $6,876,758 in forfeitures to reduce Company contributions while the Plan reported $1,967,768 in administrative expenses. Plaintiffs' own accounts were charged administrative and recordkeeping fees during the same period.

111. Northwell is liable for this claim after May 1, 2025 under the Northwell theories pleaded above. Its liability is not based on a Plan merger or parent status alone. It is based on fiduciary function, control, monitoring responsibility, knowing participation, failure to remedy breaches after it gained authority over Nuvance's governance structure, or assumed or successor obligations.

112.    Nuvance's violation was not cured by the SPD,[1] by the existence of a revenue-credit account, by the fact that some expenses may have been paid directly by Nuvance, or by the Plan's general allowance of contribution offsets. Plaintiffs do not allege that all contribution offsets were forbidden. Plaintiffs allege that the Plan required a sequence. Nuvance could use forfeitures to reduce employer contributions only after forfeitures were first applied to Plan expenses as required by Sections 14.3, 21.4, and 6.13. Northwell could not lawfully continue, approve, direct, or fail to remedy the same practice after May 1, 2025 under the Northwell theories pleaded above.

113.    As a direct and proximate result of Nuvance's failure and Northwell's post-closing fiduciary failure or assumed obligation, the Plan and participants suffered losses, including Plan expenses and participant-account charges that forfeitures should have paid first, lost investment earnings, and contribution savings retained by Nuvance and any responsible Northwell entity. Nuvance is liable for pre- and post-closing losses caused by its conduct. Northwell is liable for post-closing losses and gains tied to the Northwell theories pleaded above.

### PRAYER FOR RELIEF

*WHEREFORE*, Plaintiffs, on behalf of the Plan and the Class, respectfully request that the Court:

114.    Certify this action as a class action under Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

---

[1] Nuvance will likely point to the SPD sentence stating that forfeitures reduce Employer Contributions for the current Plan Year. That sentence does not override the Plan document. The SPD is a summary, and the SPD itself states that the actual Plan controls if the summary and the Plan conflict. The SPD also does not say that forfeitures reduce employer contributions before Plan expenses are paid. Nuvance therefore cannot use the SPD to invert Sections 14.3, 21.4, and 6.13.

115. Declare that Nuvance breached its fiduciary duties, failed to follow the Plan, engaged in prohibited fiduciary self-dealing, and violated ERISA as alleged, and declare that Northwell is liable for post-closing breaches and assumed or successor obligations under the Northwell theories pleaded above;

116. Order Nuvance to make good to the Plan all losses caused by its ERISA violations, including expenses that forfeitures should have paid, excessive recordkeeping and administrative fees, and lost investment earnings, and order Northwell to make good losses tied to its post-closing fiduciary conduct, knowing participation, failure to monitor fiduciaries it appointed or controlled, failure to remedy known breaches, or assumed or successor obligations;

117. Order disgorgement of all profits, contribution savings, offsets, and other benefits Nuvance obtained through its ERISA violations, and order disgorgement from Northwell for benefits tied to the Northwell theories pleaded above;

118. Order Nuvance and Northwell to provide all accountings necessary to determine the amounts for which each is responsible, including an accounting of all forfeitures, Plan expenses, participant-account charges, revenue credits, direct payments, indirect compensation, float or cash-sweep income, and all amounts paid to Fidelity or other service providers during the Class Period;

119. Surcharge Nuvance, and surcharge Northwell under the Northwell theories pleaded above, in favor of the Plan for all amounts that the accounting shows were improper, excessive, misallocated, or obtained through breach;

120. Impose a constructive trust or equitable lien over amounts traceable to the misuse of forfeitures and excessive fees;

121.    Remove fiduciaries who breached their duties and, if necessary, appoint an independent fiduciary to administer forfeitures, fees, and remedial allocations;

122.    Enjoin Nuvance, and Northwell under the Northwell theories pleaded above, from using or permitting forfeitures to reduce employer contributions before Plan expenses are paid in the order required by the Plan;

123.    Order Nuvance, and Northwell under the Northwell theories pleaded above, to conduct a competitive request-for-proposal process for recordkeeping and administrative services and to pay no more than reasonable compensation for those services;

124.    Order reformation of Plan administration practices, not Plan benefits, to ensure future compliance with ERISA and the Plan documents;

125.    Award attorneys' fees and costs under ERISA Section 502(g), 29 U.S.C. Section 1132(g), and the common-fund doctrine; and

126.    Grant all other legal, equitable, or remedial relief the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 10th day of June 2026.

Respectfully submitted,
*/s/Ephraim J. Fink, Esq.*
**EPHRAIM J. FINK, ESQ.**
**MORGAN & MORGAN, P.A.**
157 Church St 19th Floor
New Haven, CT 06510
Tel: (475) 204-3101
Cell: (203) 918-0263
Firm Juris No.: 446919
File Matter No.: 2033919
E-mail: ephraim.fink@forthepeople.com

**MARC R. EDELMAN**
Florida Bar Number: 0096342
(pro hac vice motion forthcoming)
**MORGAN & MORGAN, P.A.**
201 North Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: (813) 577-4722
Facsimile: (813) 257-0572
Email: medelman@forthepeople.com

**MICHAEL MCKAY**
(pro hac vice motion forthcoming)
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

**LUIS A. CABASSA**
(pro hac vice motion forthcoming)
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
(pro hac vice motion forthcoming)
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Facsimile: (813) 229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

*Attorneys for Plaintiffs and the Proposed Class*

37